## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

DENNIS CHASTAIN, et al.,           )
                                   )
      Plaintiffs,                )
                                   )
vs.                                )     Case No.  CIV-04-0281-F
                                   )
AT&T,                              )
                                   )
      Defendant.                 )

## ORDER

Defendant's motion for summary judgment is before the court. (Doc. no. 118.) The motion has been fully briefed and is ready for disposition.  Defendant's motion to strike jury demand (doc. no. 93) and plaintiffs' motion to certify class (doc. no. 95) are also before the court.

### I.  Standards for Summary Judgment

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant.  United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996).  Once the

moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial.  Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

## II.  Introduction

Plaintiffs are four management retirees, each of whom began work for Western Electric Corporation ("Western Electric") decades ago and then continued to work for AT&T Corporation ("AT&T") in the manufacturing division that had once been Western Electric.  Each of the plaintiffs retired prior to the time that AT&T created Lucent Technologies Inc. ("Lucent"), a company which included the business units operated by the former Western Electric.  Effective October 1, 1996, as a part of the restructuring transaction in which AT&T spun-off Lucent, plaintiffs and other retirees who had worked in the Western Electric segment were moved from AT&T-sponsored pension and welfare benefit plans to Lucent-sponsored plans.[1]  The plan benefits in issue in this action were diminished and eventually eliminated by Lucent, acting in its role as plan sponsor.  Aggrieved by the reduction in benefits, plaintiffs brought this action against their former employer, AT&T, in March of 2004.

As is appropriate at this dispositive motion stage, plaintiffs have considerably narrowed and refined their claims since the filing of the amended complaint.  In response to defendant's properly supported motion, which seeks summary judgment in defendant's favor on all claims, plaintiffs' briefing papers repeatedly characterize the claims alleged in this action as claims for recovery of plan benefits under ERISA,

---

[1]This order does not always distinguish between AT&T and AT&T-sponsored plans, references which may be used interchangeably except when the context dictates otherwise.  The same is true for references to Lucent and Lucent-sponsored plans.

§502(a)(1)(B), codified at 29 U.S.C. §1132(a)(1)(B).[2] Accordingly, except for claims which Judge Leonard previously dismissed,[3] the court finds that all claims other than plaintiffs' §1132(a)(1)(B) claims to recover plan benefits have been abandoned, or confessed for lack of developed argument, and such claims are dismissed on that basis. Alternatively, the court finds that, other than the claims pressed under §1132(a)(1)(B), no claims could be brought by these plaintiffs under any of the other civil enforcement provisions of §1132(a), in any event.[4] Thus, although Rule 56(c) requires the court to consider the pleadings and the court does so in reaching the

---

[2]For example, quoting the statute, plaintiffs state: "These are primarily claims by a 'participant or beneficiary of a plan to recover benefits due to him under the terms of his plan' under 29 U.S.C. §1132(a)(1)(B)." (Doc. no. 126, p. 31.) Plaintiffs' briefing papers do not describe any claims based on misrepresentation, reliance, breach of fiduciary duty, state or federal common law, or any claims seeking equitable relief. (Although the court confines the arguments to those presented in support of the instant motion, it notes that at the hearing on the motion to certify a class, plaintiffs expressly disclaimed any reliance-based claims. At that time, plaintiffs also addressed the possibility of reinstatement in AT&T plans, but plaintiffs' summary judgment papers do not address reinstatement or any other type of equitable relief.) Plaintiffs' sur-reply brief takes no exception at all to defendant's statement (found at doc. no. 131, p. 7) that plaintiffs "clearly and unequivocally frame and confine their claims as ones proceeding under Section 502(a)(1)(B)." The court concurs with that statement.

[3]Judge Leonard dismissed state law claims for "Breach of the Implied Covenant of Good Faith and Fair Dealing," alleged in the second claim of the first amended complaint. (Doc. no. 29, p. 3.)

[4]Section §1132(a)(2) (fiduciary breach), does not provide an individual remedy. Varity Corporation v. Howe, 516 U.S. 489, 515 (1996). Because §1132(a)(1)(B) covers their claims, plaintiffs could not recover other appropriate equitable relief under §1132(a)(3). See, Varity at 515 ("where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be appropriate"). As yet another, alternative basis for dismissal of §1132(a)(3) claims, plaintiffs do not contest defendant's contention that the types of claims traditionally asserted under §1132(a)(3), i.e. claims for breach of fiduciary duty or wrongful plan termination, are time-barred.

determinations stated in this order, the first amended complaint no longer bears much resemblance to the claims as pressed.  (Doc. no. 3.)[5]

Thus, this action now stands as one seeking to recover plan benefits due under ERISA, 29 U.S.C. §1132(a)(1)(B).  Plaintiffs seek to recover three particular types of plan benefits under that statute.  The first benefit in issue is referred to in this order as "the death benefit."  Loosely summarized, the death benefit is equivalent in amount to approximately one year of the decedent's "base pay" (a defined term) at the date of the decedent's retirement.[6]  It could be applied for by an eligible beneficiary within one year of the retiree's death.  Eligible beneficiaries, for example, included (but were not necessarily limited to) a lawful spouse, dependent children up to the age of 23, and older in some circumstances, or dependent parents in some cases.  Although paid from the death benefits section of the AT&T Management *Pension* Plan at the time of the plaintiffs' retirement, the parties agree that the death benefit is actually an employee *welfare* benefit.[7]  The other benefits in question are also employee welfare benefits.  The second benefit claimed is plaintiffs' entitlement to reimbursement for Medicare Part B premiums paid by the plaintiffs.  The third benefit claimed is plaintiffs' entitlement to paid dental coverage.  Each of these three benefits is governed by a different employee benefit plan.

---

[5]Claims for plan benefits under § 1132(a)(1)(B) are deemed alleged in the first claim for relief of the first amended complaint, entitled "Breach of Express Agreement." See Judge Leonard's order denying judgment on the pleadings, noting defendant's argument that the first claim arguably raises a claim to recover benefits under §1132(a)(1)(B).  (Doc. no. 29, p. 3.)

[6]Plaintiffs state that the death benefit equals the higher of the employee's last year's annual pay or the previous 12 months' includable compensation. (Doc. no. 126, p. 18.)

[7]*And see*, Foss v. Lucent Technologies, Inc., 2006 WL 3437586 at *7-*8 (D.N.J. 2006)(classifying the same death benefit as an employee welfare benefit despite the fact it was funded from pension assets).

-4-

In short, the essence of plaintiffs' position in this action is that, pursuant to promises made by AT&T in the relevant plan documents, plaintiffs' interests in each of these three types of benefits were vested, so that when Lucent did away with these benefits, it did so in violation of the terms of the relevant plans, giving rise to plaintiffs' claims under §1132(a)(1)(B), "to recover benefits due to [the plaintiffs] under the terms of [the plaintiffs'] plan...."

Defendant's motion challenges the viability of this action on a number of grounds, the first of which is that AT&T is not properly named as a defendant in connection with plaintiffs' claims to plan benefits, because plaintiffs are not participants in any AT&T plan. This is a threshold issue which implicates both standing and jurisdiction. Felix v. Lucent Technologies, Inc., 387 F.3d 1146, 1160, n.14 (10th Cir. 2004). Accordingly, the court takes this issue up first.

### III. Threshold Issue

As a preliminary matter, the facts relating to the Employee Benefits Agreement between AT&T Corp. and Lucent Technologies Inc., dated February 1, 1996 (the EBA) must be understood. Applying the standards of Rule 56, the court finds the following facts (as it does all facts stated anywhere in this order) as a matter of law, either because they are expressly admitted, or because plaintiffs have not shown any genuine issue of material fact with respect to them.

### A. Fact-findings Pertaining to the Employee Benefits Agreement

The EBA between AT&T and Lucent was entered into by those companies as a part of AT&T's spin-off of Lucent. As indicated by its title, the EBA governs employee benefits, including the relationship between AT&T-sponsored employee benefit plans and Lucent-sponsored employee benefit plans. There is no dispute regarding the content of the EBA, pertinent parts of which are attached to defendant's

moving brief.  (Doc. no. 119, Ex. C.)[8]  As to all matters pertinent to this action, the effective date of the EBA was October 1, 1996.  (*See*, defendant's Undisputed Material Fact "UMF" Nos. 16, 17.)[9]

Retirees such as the plaintiffs are within the EBA's definition of "transferred individuals."  (*See*, EBA § 1.111.)  The EBA provides that as of October 1, 1996, all transferred individuals, thereby including the plaintiffs in this action, are transferred from AT&T-sponsored employee benefit plans to Lucent-sponsored employee welfare benefit plans.  The EBA terminated plaintiffs' participation in AT&T plans and began plaintiffs' participation in Lucent plans, effective October 1, 1996.  (Def UMF Nos. 5, 6, 16, 17, 35, 44.)

Under the EBA, Lucent assumed all liabilities that AT&T previously had to all of the retirees transferred from AT&T-sponsored plans to Lucent-sponsored plans.  (Def UMF No. 55; Ex. C § 2.1(a).)   For example, the EBA provides that:  "Immediately after the Distribution Date, all Liabilities to or relating to Transferred Individuals under the AT&T Health and Welfare Plans shall cease to be Liabilities of the AT&T Health and Welfare Plans and shall be assumed by the corresponding Lucent Health and Welfare Plans."  (EBA §5.2(a).)

More specifically, with respect to the death benefit, plaintiffs were transferred from the AT&T Management Pension Plan to the Lucent Technologies Inc.

---

[8]Plaintiffs dispute the legal effect of the EBA, arguing that AT&T remains liable for the plan benefits because AT&T "delegated" plan liabilities to Lucent without plaintiffs' consent.  This legal argument is addressed in detail later in this order.  Plaintiffs also attack the *bona fides* of the EBA, arguing that Lucent was "prostrate" in  negotiating its separation from AT&T, and accusing Lucent of financial malfeasance.  These arguments are immaterial because this action does not challenge the spin-off itself.

[9]The EBA refers to the date on which the matters pertinent to this action would become effective as the "distribution date."  There is no dispute that the distribution date was on or about October 1, 1996, so this order refers to October 1, 1996 as the effective date "provided" by, or "pursuant to," the EBA.

Management Pension Plan, later renamed the Lucent Retirement Income Plan.  With respect to the Medicare Part B reimbursement benefit and the dental coverage benefit, plaintiffs were transferred from AT&T-sponsored employee welfare plans (including, among others, the AT&T Medical Expense Plan for Retired Employees and the AT&T Dental Expense Plan for Retired Employees), to Lucent-sponsored employee welfare benefit plans (including, among others, the Lucent Medical Expense Plan for Retired Employees and the Lucent Dental Expense Plan for Retired Employees).  All of this occurred pursuant to the EBA, on about October 1, 1996, at which time the  plaintiffs became participants in Lucent's plans.[10]  Plaintiffs continue to participate in the relevant Lucent-sponsored plans.  (Def UMF Nos. 5, 6, 16, 17, 35, 44.)

The EBA provides that nothing in that agreement shall preclude Lucent, at any time after the distribution date of October 1, 1996, from making any changes – including modifying, eliminating or reducing any benefit – in any Lucent-sponsored plan or benefit.  (Def UMF Nos. 18, EBA, § 8.6.)

 As permitted by the EBA, Lucent, in its role as plan sponsor, made certain changes in the benefit plans, ultimately eliminating the benefits which plaintiffs, by this action, seek to restore.  (Def UMF Nos. 21, 23, 36, 46.)  Specifically, on January 1, 1998, Lucent changed the death benefit, and in December of 2002, Lucent completely eliminated the death benefit, effective February 1, 2003.  (Def UMF Nos. 21, 23.)  This meant the benefit would no longer be paid to any survivor of any retiree participating in the Lucent Retirement Income Plan who died on or after February 1, 2003.  None of the four named plaintiffs died prior to February 1, 2003.  (Def UMF No. 24.)  On or about September 5, 2003, Lucent announced that effective October 1,

---

[10]Plaintiffs argue that they retain standing to sue AT&T as plan participants within the legal definition of that term for purposes of § 1132(a)(1)(B).  This legal argument is addressed later in this order.

2003, it would no longer reimburse its management retirees and their dependents for the cost of Medicare Part B premiums.  (Def UMF No. 36.)  Also on or about September 5, 2003, Lucent announced that effective January 1, 2004, it would no longer pay for dental coverage for its management retirees and their dependents. (Def UMF No. 46.)

AT&T is the only defendant in this action.  Plaintiffs have not sued Lucent or any Lucent-sponsored plan.  They have never sought leave to include Lucent or any Lucent-sponsored plan as a defendant.

B.  Analysis

ERISA is a comprehensive and reticulated statute, Hughes v. Aircraft Co. v. Jacobson, 525 U.S. 432, 447 (1999), an observation that is borne out by the briefing in this case.  ERISA is enormously complex and detailed, *id*., and can be a fruitless and thorny ground for plaintiffs.  Lind v. Aetna Health, Inc., 466 F.3d 1195, 1197 (10th Cir. 2006).  The Supreme Court has admonished that ERISA "should not be supplemented by extratextual remedies."  *See*, Hughes, 525 U.S. at 447 (ERISA not supplemented by common law wasting trust doctrine).

An action, such as this one, to recover plan benefits, is governed by the criteria of § 1132(a)(1)(B).  That provision states, in pertinent part, as follows.

> A  civil  action  may  be  brought...by a participant or
> beneficiary...to recover benefits due to him under the terms
> of his plan....

Defendant argues that plaintiffs lack the status of current participants in AT&T-sponsored plans, which is a requirement for suit under the above-quoted

statutory language.[11]  Defendant makes this argument in reliance on the fact that, as of October 1, 1996, the EBA terminated plaintiffs' participation in AT&T plans and began plaintiffs' participation in Lucent plans.  As previously noted, this contention raises both standing and jurisdictional issues under ERISA.  Felix, 387 F.3d at 1160, n.14.  As a result, plaintiffs must either fit their claims to recover plan benefits within the statutory framework, or face dismissal.

In support of its contention that plaintiffs cannot show that they are participants within the meaning of § 1132(a)(1)(B), defendant relies, first, on the Supreme Court's decision in Varity Corporation v. Howe, 516 U.S. 489 (1996).  Varity addresses ERISA remedies available against a former employer under § 1132(a)(1)(B), following Varity and Massey Ferguson's transfer of bad debts and obligations for medical and other non-pension benefits owed to retirees, to a newly created subsidiary, which Varity and Massey Ferguson knew to be insolvent, called Massey Combines.  Id. at 493-94.[12]  After Massey Combines went into receivership, employees who had been fraudulently induced to voluntarily transfer to Massey Combines, and retirees whose benefits had been involuntarily assigned to Massey Combines, sued under ERISA, seeking the benefits to which they would have been

---

[11]As indicated by the statutory language, § 1132(a)(1)(B) also authorizes suits by plan beneficiaries, but no party argues that plaintiffs are beneficiaries (as opposed to participants) for purposes of § 1132(a).  See, Felix, 387 F.3d at 1159, n.10 (where not contended they were beneficiaries, court focused on plaintiffs' status as participants).  (If, by their reference to "a beneficiary" bringing suit, at doc. no. 126, p. 25, plaintiffs intended to argue that they are beneficiaries as opposed to participants for purposes of the statute, the court rejects that argument as inapplicable in these circumstances.)

[12]The Supreme Court referred to Varity and Massy-Ferguson interchangeably, Varity at 492, and this court does likewise.

entitled under their old Massey Ferguson plan, and seeking reinstatement in that plan. *Id*. at 494-95.[13]

The Supreme Court granted *certiorari* in Varity primarily to determine whether §1132(a)(3) allowed relief to individuals. *Id*. at 495. As an integral part of its rationale for concluding that the third subsection of the statute did allow individual relief, the Supreme Court reasoned that if the plaintiffs could not seek relief under that third, "catch-all," subsection of §1132(a)'s remedial scheme, plaintiffs would have no remedy at all.[14] *Id*. at 515. The Court explained that the plaintiffs could not proceed under the second subsection, §1132(a)(2) (dealing with relief for breaches of fiduciary duty), because that subsection does not provide a remedy for individual beneficiaries. *Id*. Likewise, and most critically here, the Court explained that the plaintiffs also "could not proceed under the *first* subsection [of § 1132(a)(1)(B)] because they were no longer members of the Massey-Ferguson plan and, therefore, had no 'benefits due [them] under the terms of [the] plan.'" *Id*., quoting §1132(a)(1)(B) (emphasis in original).

---

[13]The Supreme Court did not address the retirees' claims because the petition for *certiorari* was not broad enough to include them. Varity, 516 U.S. at 496. The Court only addressed the claims of the active employees who transferred.

[14]Even if the plaintiffs in this case cannot sue under § 1132(a)(1)(B), it is important to note that they do not necessarily fall into the category of plaintiffs who "have no remedy at all." At least potentially, plaintiffs might have sued Lucent or Lucent plans under § 1132(a)(1)(B) for the benefits they seek to recover in this action. (This order does not address, directly or indirectly, the viability of a suit against Lucent, it merely notes that obvious possibility.) It should further be noted that there are times when plaintiffs may not be able to pursue claims under any of the three subsections of §1132(a). *See*, Felix, 387 F.3d at 1163, n.16 (at least one court has held § 1132(a)(3) not available, even if plaintiffs lack standing under § 1132(a)(1), where § 1132(a)(1) would otherwise provide an available remedy, citing Coyne & Delany Co. v. Blue Cross & Blue Shield of Va., Inc., 102 F.3d 712, 716 (4th Cir. 1996)); Varity, 516 U.S. at 515 (where Congress elsewhere provided adequate relief for beneficiary's injury, there is likely no need for further equitable relief and such relief normally would not be "appropriate" within the meaning of § 1132(a)(3).).

Thus, the Supreme Court clearly indicated in <u>Varity</u> that plaintiffs who are former employees because they have transferred to another employer and another employer's benefit plans as a result of a corporate restructuring, cannot proceed against their former employer under §1132(a)(1)(B), because such former employees are  no longer members of their former employer's benefit plans and thus have no ERISA claim for benefits due to them under the terms of their former employer's plans.  Although the Varity plaintiffs proceeded on very different theories of liability than the plaintiffs do here – alleging, for example, deliberate misrepresentations and thus claims for equitable relief under §1132(a)(<u>3</u>) – the similarity between the corporate circumstances in <u>Varity</u> and in this case, and the direct nature of the Court's comments regarding the lack of any possible §1132(a)(<u>1</u>)(B) claim, make it telling that plaintiffs in the instant action ignore <u>Varity</u> in their summary judgment briefing.

Defendant also relies on <u>Felix</u>, a Tenth Circuit decision which addresses the issue of standing to sue for plan benefits under § 1132(a)(1)(B) in the context of a motion to remand and related preemption questions.  <u>Felix</u>, 387 F.3d at 1158-63.  In <u>Felix</u>, former employees sued their former employer, Lucent, alleging fraud and deliberate misrepresentations which had induced them to take early retirement at the time that they did, and which resulted in plaintiffs not being offered a $15,000 payment as a part of their early retirement package although that payment was later offered to other employees taking early retirement.  <i>Id</i>. at 1150-52.

<u>Felix</u> relied on <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989) and <u>Raymond v. Mobil Oil Corp.</u>, 983 F.2d 1528, 1533 (10th Cir. 1993), as decisions which clarified the statutory definition of "participant" found in 29 U.S.C. § 1002(7)

for purposes of §1132(a)(1).  Felix, 387 F.3d at 1158-59.[15]  Quoting these cases, Felix observed that in order to be a participant, a former employee with no reasonable expectation of returning to covered employment must have a "colorable claim to vested benefits" under the plan.  Id. at 1159.  Felix concluded that the former employees did not have  colorable claims for vested benefits under §1132(a)(1)(B), because the plaintiffs had sued for damages caused by their employer's fraudulent inducement to retire, rather than to recover any  benefits due to them under the terms of their plan.  Id.  The court further reasoned that, as retirees, the plaintiffs did not have a reasonable expectation of returning to their employment at Lucent, and that the former employees had not asserted a "colorable claim to vested benefits" under ERISA "as [the plaintiffs] do not claim that they are entitled to benefits under the terms of their plan as it existed at the time of their retirement."  Id. at 1162.  Thus, Felix held that the former employees were "not 'participants' so as to bring their fraud claims within the reach of § 502(a)(1)."  Id. 1163.

In response to defendant's arguments, plaintiffs cite the above-quoted language from Felix and contend that, unlike the Felix-plaintiffs, they do "claim that they are entitled to benefits under the terms of their plan as it existed at the time of their retirement."  The problem with plaintiffs' approach is that the quoted language from Felix must be interpreted in the context of the facts of that case.  That language could not have been meant to address the question of whether former employees have a colorable claim for benefits against their former employer when the former employer's plan liabilities have been assumed by another company as a result of a

---

[15]Title 29 U.S.C. § 1002(7) provides: "The term 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit."

corporate restructuring.  That situation simply was not presented by the facts of <u>Felix</u>.

Plaintiffs also distinguish other Tenth Circuit authorities, cited by defendant for the proposition that a plaintiff must be a member of a plan in order to sue that plan under §1132(a)(1)(B).  Although these additional Tenth Circuit authorities are distinguishable on their facts, they support defendant's general position here.  *See,* <u>Felix</u>'s characterization of <u>Raymond</u>, 983 F.2d at 1536, as a case in which plaintiffs lacked a colorable claim to vested benefits because they had already received full payment of all benefits to which they were entitled; and <u>Felix</u>'s characterization of <u>Boren v. Southwestern Bell Telephone Co., Inc.</u>, 933 F.2d 891, 893-94 (10th Cir. 1991), as a case in which plaintiff was not enrolled in the pension plan at issue, and therefore had no colorable claim to vested benefits.  <u>Felix</u>, 387 F.3d at 1161.

Finally, plaintiffs argue that although <u>Felix</u> concluded that the retirees in that action had no claim for plan benefits under § 1132(a)(1)(B), the court mentioned other types of claims which possibly could be brought.  *See*, <u>Felix</u>, 387 F.3d at 1163 (noting possibility of claims for breach of fiduciary duty or claims for equitable relief under § 1132(a)(3)).  Those hypothetical avenues, however, rely on theories of liability which are either not pressed or were never available here.

Also relevant is <u>Conkin v. CNF Transportation, Inc.</u>, 2004 WL 1774775 (D. Wyo. 2004), addressing plaintiff's entitlement to sue an entity or plan in which the plaintiff is no longer a participant because plaintiff's former plan has been terminated and plaintiff has been assigned to a new plan sponsored by a spun-off company.  In <u>Conkin</u>, the court granted summary judgment to the defendant, stating that plaintiff "is precluded under applicable ERISA law from suing CNF to recover pension or employee welfare benefits" as "[h]e is not a participant in the CNF Retirement Plan

or Welfare Benefits Plan with standing to sue to recover benefits." *Id*. at *7.  The court also stated:

> Under ERISA, an employee welfare benefit plan terminates as to employees in a division, where, as occurred here, the division is spun-off to another company that provides welfare benefits.  Moreover, the original employer has no responsibility for ensuring that benefits be paid under the new welfare benefit plan.

Conkin at *7, citing Chiles v. Ceridian Corp., 95 F.3d 1505, 1515-16 (10th Cir. 1996).  Plaintiffs argue that Conkin is distinguishable because the plaintiff in that case was not able to argue that the benefits in issue were vested.  For purposes of Conkin's standing analysis, however, that is not a distinction which makes a difference.  This court also rejects plaintiffs' contention that the fact that there was a subrogation settlement agreement in issue in Conkin makes that case inapplicable here.  *And see*, Colin v. Marconi Commerce Systems Employees' Retirement Plan, 335 F. Supp. 2d 590, 597-98 (M.D.N.C. 2004) (committee which no longer had any control over benefits of former employees as a result of spin-off was "not a proper party to an action for ERISA benefits"; as the committee "currently has no control or discretion regarding Plaintiffs' benefits, it cannot provide redress of Plaintiffs' claims under § 502(a)(1)").

To extricate themselves from the threshold problem identified by AT&T, and to explain the related question of why plaintiffs contend (as they must, under their theory of AT&T's on-going liability) that the EBA was not effective to completely transfer the relevant plan liabilities (which plaintiffs sue on now) from AT&T to Lucent, plaintiffs rely on a theory derived from a footnote in Systems Council EM-3 v. AT&T, 972 F. Supp. 21 (D.D.C. 1997).  Systems Council, like this case, had its roots in the AT&T spin-off of Lucent.  Relying on Systems Council, the plaintiffs in

the instant action, argue that they may sue AT&T for the plan benefits they allege are due, despite the fact that they are no longer participants in any AT&T plans, because AT&T's obligations to them were delegated to Lucent without plaintiffs' consent to the EBA or to any purported transfer of liability for their plan benefits from AT&T to Lucent.   Accordingly, plaintiffs cite <u>Systems Council</u> for the proposition that "AT&T remained ultimately liable for any promises it had made to the retirees." (Doc. no. 126, p. 5 of 50 n.19.)   <u>Systems Council</u>, however, did not so hold.   The contract claims in that case, which merely raised the possibility of AT&T's on-going liability, were dismissed by the court as not ripe for adjudication.   *Id*. at 39-40. Nevertheless, given plaintiffs' reliance on <u>Systems Council</u> throughout their briefing, this court feels compelled to address plaintiffs' argument in considerable detail.

In <u>Systems Council</u>,[16] the district court dismissed claims brought by current and retired employees of AT&T and Lucent seeking legal review under certain ERISA provisions which are not relevant to the instant action, and also under certain common law contract theories of liability which are not relevant here.[17]   The note which plaintiffs rely on, found at <u>Systems Council</u>, 972 F. Supp. at 40, n. 37, appears as part of the court's discussion of the lack of any justiciable controversy with respect to plaintiffs' breach of contract claims.   *Id*. at 38-40.   The court observed that "there is no allegation that AT&T promised not to delegate its obligations under the contract

---

[16]Unless otherwise indicated, all references to <u>Systems Counsel</u> are to the district court memorandum opinion, not the D.C. Circuit opinion.

[17]The ERISA claims challenged the means and manner in which AT&T spun-off Lucent. *See, id*. at 26, 33-38 (plaintiffs objected to the procedures and formulas to be used for division of pension plan assets in conjunction with the spin-off, including distribution of residual assets, underlying actuarial assumptions, and timing of asset valuation).   Most of the breach of contract claims alleged anticipatory breach.   *Id*. at 40.   Plaintiffs also alleged that the EBA's delegation of liability constituted a breach of contract, an argument the court rejected.   *Id*. at 39-40.

to a third party and, thus, there can be no claim of injury by the simple fact of delegation." *Id.* at 39-40.  The court followed that observation with the following footnote.

> It is a well-settled principle that, unless otherwise agreed by the parties, contract obligations may be delegated to a third party. *See* Restatement, Second, Contracts § 318, at 19 (1981).  If the third party fails to perform, the person to whom the duty flows *may* have a cause of action against the delegating party. *See* Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1278 (10th Cir. 1994).

*Id.* at 40 n.37.  (Emphasis added.)

This note has no relevance to claims alleged under ERISA, much less to claims brought under the specific statutory criteria set out in §1132(a)(1)(B).   No §1132(a)(1)(B) claims to recover plan benefits were presented in Systems Council. They could not have been, because no plan benefits had yet been reduced or eliminated by Lucent.  This court concludes that the opinion briefly expressed in note 37 simply could not have been meant to suggest that the enormously complex and reticulated requirements for bringing suit under the civil enforcement remedies of ERISA are trumped by common law contract theories. *See*, Hughes, 525 U.S. at 447 ( ERISA is enormously complex and detailed, and not to be supplemented by extra-textual remedies such as the common law doctrine of wasting trusts), decided by the Supreme Court after Systems Council; Foss, 2006 WL 3437586 at *10 (involving same death benefit as this case; observing that, under Hughes, it is inappropriate to supplement ERISA with remedies derived from the federal common law of unilateral contracts).

The immateriality of the Systems Council note 37 is further underscored by the obvious fact that since the contract claims presented no case or controversy, any statement the court might have made touching on AT&T's on-going liability was

dicta.  On appeal, the D.C. Circuit affirmed the district court's conclusion that the breach of contract claims were not ripe without addressing whether AT&T might or might not have on-going liability after the assignment.  *See*, <u>Systems Council EM-3 v. AT&T</u>, 159 F.3d 1376, 1382-83 (D.C. Cir. 1998).

Additionally, if plaintiffs are correct that their theory of contract law is viable, permitting this ERISA suit against AT&T, they have not adequately answered defendant's contention (doc. no. 131, p. 23), with which the court agrees, that plaintiffs' acceptance of increased pension payments, and defendant's alteration of medical and dental benefits (sometimes to plaintiffs' benefit and sometimes to plaintiffs' detriment), created a novation, substituting Lucent for AT&T in any contractual relationship.

Moreover, plaintiffs' argument that a company  cannot, despite the provisions of an employee benefit agreement, transfer plan liabilities to another company without the consent of plan participants, conflicts with 29 U.S.C. § 1058 if any of the subject plan liabilities are pension plan liabilities.  This is true because § 1058 expressly authorizes transfers of pension assets and liabilities so long as certain requirements are met.  Furthermore, if § 1058 allows transfers of liability for pension assets, but plaintiffs' theory disallows transfer of welfare plan liabilities without the consent of participants, the result would be that welfare plans are provided more protections then pension plans are provided – a result at odds with ERISA's general approach.  *See*, <u>Chiles v. Ceridian Corporation</u>, 95 F.3d 1505, 1510 (10th Cir. 1996) (ERISA distinguishes between two types of employment benefits, welfare benefits and pension benefits; noting Congress's handling of the different vesting requirements associated with each).

Finally, as a practical matter, plaintiffs' theory suggests that liability for welfare benefit plans could never, or almost never, be completely transferable to another plan or entity, because all participants might not consent to a complete transfer of plan liability.  Although such a rule might benefit the plaintiffs in this action, in the long run, knowledge that employee benefit plans may be transferred provides the type of flexibility which ultimately inures to the advantage of all employees, an appropriate policy goal recognized by ERISA.  *Cf.*, Frahm v. Equitable Life Assurance Society of the U.S., 137 F.3d 955, 962 (7th Cir. 1998) (when changing the terms of a plan, the employer may act to promote its own interests; "[i]n the short run use of this power may injure retirees; but in the longer run, knowledge that plans may be changed encourages employers to make better offers to their labor force").

For all of these reasons, the court rejects plaintiffs' contention that their "note 37" theory of liability derived from Systems Counsel keeps the EBA from being effective to do as it purports to do, which is to completely transfer the plan liabilities in question from AT&T to Lucent.[18]  This court likewise rejects any other arguments offered by the plaintiffs in support of their position that they now have a viable action against AT&T, despite the fact that they are not participants in any AT&T plan.  The court finds and concludes that AT&T and AT&T-sponsored plans have no liability for plaintiffs' claims.[19]  Plaintiffs are not participants in, or members of, a plan, for

---

[18]Regarding other courts' and parties' presumptions regarding the effectiveness of the EBA to transfer plan liabilities, *see also*, the circuit decision in Systems Counsel EM-3 v. AT&T, 159 F.3d at 1383 (observing AT&T "has simply assigned its welfare plan obligations to Lucent"); Systems Counsel, 972 F. Supp. at 29 (plaintiffs challenged AT&T's "allocation of plan assets and liabilities resulting from the spin-off of Lucent and its benefit plans"); and Foss, 2006 WL 3437586 at *1(involving the same death benefit as is involved in this action, and stating that "Lucent assumed and agreed to pay AT&T's benefit obligations to certain former employees").

[19]As two other instances of litigation having their roots in the AT&T-Lucent spin-off, it is worth noting that the plaintiffs in Systems Council and in Foss sued both Lucent entities and AT&T entities.

purposes of bringing suit against AT&T in this action.  Plaintiffs do not have a claim for benefits due them under the plan within the meaning of §1132(a)(1)(B), or for any other purpose relevant to this action. Plaintiffs do not have a colorable claim against AT&T for plan benefits due to them at the time of their retirement.  In these circumstances, plaintiffs do not have standing to sue AT&T in this action.

AT&T is entitled to dismissal of plaintiffs' claims, and AT&T's motion for summary judgment should be granted to that extent.

IV.  Merits Issues

If any court should be reluctant to address merits issues, it is this one, after its discussion of the dicta contained in note 37 of Systems Council.  Nevertheless, this court is keenly aware of the passage of time since this action was first brought, of the reassignment of this case from Judge Leonard to the undersigned, of the time it has taken to get the instant motion fully at issue and addressed, of the age of the plaintiffs and of others in any potential class, and of the fact that this court may not be the last to address the issues covered in this order.  Therefore, in the hope that plaintiffs might at least be spared more than one trip to the Court of Appeals should this court be mistaken with respect to its determinations stated to this point, the court goes on to address selected merits issues, as an alternative basis for its grant of summary judgment to the defendant.

Defendant's motion challenges all of the claims alleged in this action by arguing that none of the benefits claimed were vested benefits, so that Lucent had the legal authority to do away with them.  Thus, the viability of all of plaintiffs' claims depends upon the correctness of plaintiffs' underlying contention that the benefits they seek to recover were vested at the time Lucent did away with those benefits, or, as more precisely argued in plaintiffs' briefs, that the benefits were vested at the time plaintiffs either retired or (with respect to the death benefit) became qualified for a

service pension.  Before addressing these vesting arguments as they pertain to each of the benefits in question, it is necessary to review some general principles regarding the vesting of employee welfare benefits.

As distinguished from pension benefits, benefits provided under a welfare benefit plan need never vest.  Chiles, 95 F.3d at 1510.  As stated earlier, Congress intentionally exempted welfare benefit plans from ERISA vesting requirements, determining that to require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.  *Id.*  An employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits.  *Id.*  If it does contractually agree to grant vested benefits, then a plan sponsor who changes the vested benefits granted in a welfare plan may be liable to a beneficiary under the plan.  *Id.*

An employee benefit plan must be established by a written instrument, and a promise to provide vested benefits must be incorporated, in some fashion, into the formal, written ERISA plan.  *Id.* at 1511.  In interpreting the terms of an ERISA plan, the court examines the plan documents as a whole and, if unambiguous, construes them as a matter of law.  *Id.*  The court gives plan language its common and ordinary meaning, as a reasonable person in the position of the plan participant would have understood it.  *Id.*

Because welfare benefits do not statutorily vest under ERISA, plaintiffs carry the burden of showing an agreement to vest.  *Id.*  Moreover, contractual vesting of a welfare benefit is an extra-ERISA commitment which must be stated in clear and express language.  *Id.* at 1513.  In short, contractual vesting is a narrow doctrine.  *Id.*

## A. The Death Benefit

In Foss, the New Jersey district court considered challenges to Lucent's elimination of the same death benefit that is in issue here. Foss was brought by AT&T retirees (and their beneficiaries) who had retired prior to the time the death benefit was eliminated by Lucent. *Id*. at *1. In denying plaintiffs' claims, Foss found that the plaintiffs had not identified any plan language which clearly and expressly vested the death benefit at the time plaintiffs became eligible for retirement, or at the time of plaintiffs' retirement. *Id*. at *9. Foss reasoned that the presence of the conditions on plan participants' eligibility for the death benefit – such as the survival of an eligible beneficiary – underscored the fact that there was no automatic vesting language and that the death benefit only vested when the plan participant died and was survived by qualified beneficiaries. *Id*. at *9. This court agrees with the reasoning of Foss.

Furthermore, in this action, it is undisputed, and the court finds, that the plan language contained a reservation of rights clause which, in its various incarnations, stated substantially as follows.[20]

> The Board of Directors, or its delegate, may from time to time make changes in the Plan as set forth in this document, or terminate said Plan, but such changes or termination shall not affect the rights of any Employee, without his or her consent, to any benefit or pension to which he or she may have previously become entitled hereunder.

(Def UMF No. 19).

This clause reserves the right of the plan sponsor to change or eliminate employee benefits, qualifying that right by one exception only. That exception applies when employees have previously become entitled to benefits, *i.e.* the exception

---

[20]Plaintiffs argue about the legal interpretation of the clause, but they do not dispute its content, and they refer to it in their briefing as a reservation of rights clause, stating "It is true that the Death Benefit has always been subject to the following reservation of rights clause...." (Doc. no. 126, p. 42.)

applies to benefits which have, by some other mechanism, previously become vested. Plaintiffs describe this clause as "the ratchet clause," and argue that it vests the death benefit by entitling plaintiffs to no future diminishment of that benefit absent plaintiffs' consent.  By its own terms, the clause simply does not do that.  Moreover, vesting language must be clear and express.  <u>Chiles</u>, 95 F.3d at 1513.  As a matter of law, the court concludes that this reservation of rights clause does not vest any future entitlement on the plaintiffs' part to a permanently undiminished death benefit (or to any other benefit in issue in this action).

This court concludes, as <u>Foss</u> did, that vesting of the death benefit occurs when the plan participant dies, with a qualified beneficiary surviving.  <u>Foss</u> at *9.  It is undisputed that all four of the plaintiffs were living at the time the death benefit was eliminated in 2003.  It necessarily follows that none of the plaintiffs had a vested entitlement to the death benefit at the time Lucent reduced or eliminated that benefit.

Plaintiffs also rely on <u>Devlin v. Empire Blue Cross & Blue Shield</u>, 274 F.3d 76 (2d Cir. 2001) for their contention that "where AT&T promised benefits under the Ratchet Clause, then assured plan participants that those benefits would not be taken without their consent, a unilateral contract was formed once Plaintiffs became eligible for the benefits, which unilateral contract Plaintiffs seek to enforce."  (Doc. no. 126, p. 41.)  The court has already rejected the first qualifier, as it has found that AT&T promised no benefits under what plaintiffs call the ratchet clause.  To the extent plaintiffs might nevertheless argue that <u>Devlin</u> somehow continues to help them here because they continued to work, the court rejects plaintiffs' notion that an employee's beginning work, or an  employee's "becoming eligible" for benefits by continuing to work past the time benefits are provided, constitutes "performance" which then results in a unilateral contract, and which then, in turn, prohibits future changes to benefits

provided but not otherwise vested.[21]  *See*, Averhart v. US West Management Pension Plan, 46 F.3d 1480, 1486-87 (10th Cir. 1994) (ERISA case rejecting federal common law theory of estoppel), citing Miller v. Coastal Corp., 978 F.2d 622 (10th Cir. 1992) as an ERISA case which rejected federal common law estoppel theory, where employee had much more prior service to his credit than the pension plan committee had recognized.  Plaintiffs' reading of Devlin (as creating vested, unilateral contract obligations resulting from the fact that plaintiffs continued to work for AT&T), cannot be squared with the congressional intent not to bind employers in the area of welfare benefits.  *See*, Chiles, 95 F.3d at 1510 (employer may unilaterally modify or terminate welfare benefits unless it contractually agrees to grant vested benefits).  Finally, Devlin is simply of no help to plaintiffs here because, unlike the defendant in Devlin, AT&T maintained a reservation of rights clause (the ratchet clause) during the time plaintiffs would refer to as the time of their "performance."

Separate and apart from any other grounds stated in this order, these findings and conclusions entitle defendant to summary judgment in its favor on the merits of plaintiffs' claims to the death benefit.

## B.  Medicare Part B Reimbursements and Dental Benefits

It is undisputed that the summary plan documents covering both medical and dental benefits for retirees, which were in effect when plaintiffs Chastain, Patterson and Walker retired at the end of 1989 (and medical and dental plan documents previously in effect), set forth the company's reservation of its rights to change or discontinue retiree medical and dental benefits.  (Def UMF Nos. 27-32, 40-41.)  It is also undisputed that AT&T maintained a statement of its right to make changes to the retiree medical and dental benefits through the date of the spin-off of Lucent and the

---

[21]For example, plaintiffs state:  "Devlin held that where an employee begins 'performing' on the agreement with his employer for benefits, that contract for benefits cannot be modified or revoked while performance continues."  (Doc. no. 126, p. 25.)

transfer of the plaintiffs from AT&T-sponsored plans to Lucent-sponsored plans. (Def UMF Nos. 33, 42.)  Indeed, plaintiffs expressly "concede that the regular medical plans generally reserved the right to amend, modify or terminate the plans." (Doc. no. 126, p. 22.)   Thus (excluding, for the moment, issues pertaining to the special retirement option, the "SRO"), the court finds that the relevant medical and dental plans  included reservation of rights clauses which clearly allowed elimination of Medicare Part B reimbursement and dental coverage.

For these reasons, plaintiffs' arguments that their interests in Medicare Part B reimbursement and in dental benefits were vested interests do not rest on the above-described plan documents; rather, they rest on the premise that a new, stand-alone ERISA plan was created by AT&T in conjunction with the SRO, at the time of the Lucent spin-off.  Plaintiffs Chastain, Patterson and Walker retired pursuant to the SRO.  They contend that this new, stand-alone ERISA plan, created by specified SRO documents, vested plaintiffs' entitlement to permanently undiminished medical and dental benefits.[22]  Defendant's motion challenges the existence of any stand-alone ERISA plan in conjunction with the SRO.  Defendant also argues that even if a stand-alone plan is presumed, plaintiffs have not identified any clear and express language vesting their entitlement to permanently undiminished Medicare Part B reimbursements or dental coverage.

Plaintiffs stand on three documents which they say "fully describe the stand-alone plan contemplated under the SRO" and constituted the "entire universe of documents that were expressly referenced by AT&T in explaining the Plaintiffs' medical and dental insurance benefits under the SRO...."  (Doc. no. 126, p. 11-12.) These documents are attached to plaintiffs' response brief (doc. no. 126) as Exhibits

---

[22]Plaintiffs also argue that Mr. Schricker, who retired in 1975, is covered under the 1989 SRO stand-alone plan because the stand-alone plan "encompasses anyone who retired before March 1, 1990."  (Doc. no. 135, p. 4.)

10, 16 and 32.[23]   Defendant's first argument regarding the lack of viability of any claims based on the proposed separate plan is that plaintiffs may not be permitted to string together several documents to constitute such a stand-alone ERISA plan.  While this court is not prepared to say that no stand-alone plan could, under any circumstances, be constituted by more than one document, or even by a collection of documents, it agrees with defendant that the documents cited by plaintiffs are very different in nature from the letter to employees which the Tenth Circuit construed in DeBoard v. Sunshine Mining and Refining Company, 208 F.3d 1228 (10th Cir. 2000), as a stand-alone plan.  The documents plaintiffs rely on here are also quite different in nature and number from the four plan documents which the Tenth Circuit construed as separate plans, rather than as a single ERISA plan, in Chiles v. Ceridian Corporation, 95 F.3d 1505, 1511 (10th Cir. 1996).

Furthermore, two of the three documents explicitly state that they do not create any contractual rights.[24]   Exhibit 10 (at p. 3), states as follows.  "The information in this document is not a contract of employment, and is not intended to create any

---

[23]Plaintiffs state that other documents also "delineated a comprehensive package of benefits – an ERISA plan." (Doc. no. 126, p. 4.)  However, read in context with the arguments developed in their briefing, it is clear plaintiffs stand exclusively on exhibits 10, 16 and 32, as the three formal plan documents, whether that characterization is taken from plaintiffs' adoption of AT&T's initial characterization of those documents, or plaintiffs' independent characterization of the documents. For example, plaintiffs' characterize other documents as merely:  "supplemental information on the SRO," as "memoranda with additional guidance on the SRO" (p. 4), as "extrinsic" (p. 12), or as "illustrative" (p. 14).   Plaintiffs also object to defendant's reference to these other types of documents, as references to "extrinsic evidence" (p. 12).  Regardless, even if plaintiffs were to rely on additional exhibits as stand-alone plan documents, it would not change the results stated in this order.

[24]The other document, Ex. 16, is described in defendant's reply brief as a collection of various documents, and excerpts from documents, provided at different times and for different purposes.  (Doc. no. 131, p. 9, n.8.)  As these facts are not included in defendant's statement of proposed undisputed material facts, plaintiffs have not been required to dispute them with evidence, and the court does not rely on defendant's description of these documents for any of the determinations stated in this order.  The court simply notes that plaintiffs do not dispute defendant's description in their sur-reply.

contractual rights, either express or implied, between AT&T and its employees." Exhibit 32, is a video tape script. The written version of the script begins with the following statement, on the title page: "This video includes information on AT&T's benefit plans and programs. The actual plan provisions contained in formal plan documents will be solely relied upon and will govern interpretations and administration of AT&T's benefit plans and programs." Plaintiffs' sur-reply brief states that this language was not read to, or viewed by, plaintiffs at the time of the video presentation, but plaintiffs cite no evidence in support of that contention.

It is also undisputed, and the court finds, that all of plaintiffs' proposed stand-alone plan documents make many references to other AT&T plans. The documents refer to some plans quite explicitly. While the proposed stand-alone plan documents do not re-state, or specifically refer to, AT&T's reservation of rights clauses in those other plans, they make general references to the plans, thereby incorporating by reference any reservation of rights language. For example, Exhibit 10 states that "seminars will provide...an overview of retiree benefits, including information on... Medical and Dental Insurances..." (Ex. 10, p. 13.) Exhibit 32 refers to "the Medical Expense Plan." (Ex. 32, p. 14.) Exhibit 16 refers several times to coverages under "the Medical Expense Plan" (at section 2, p. 5), and explains that when both spouses work for AT&T, benefits coordinate "according to the specific Medical Expense Plan under which each is covered." (Ex. 16, section 2, p. 7.) These consistent and repeated references to the existing plans rebut plaintiffs' argument that the documents plaintiffs rely on created a separate, stand-alone ERISA plan for employees retiring under the SRO.

For cases from other circuits granting summary judgment to defendants when no separate ERISA plans were created because the proposed plan documents referenced existing ERISA plans, see Balestracci v. NSTAR Electric and Gas Corp.,

449 F.3d 224, 232 (1st Cir. 2006) (no separate ERISA plan created by early retirement program brochures and plan summaries, where documents prominently refer to existing ERISA plans as providing more specific terms); Stearns v. NCR Corporation, 297 F. 3d 706, 711-12 (8th Cir. 2002) (no free-standing ERISA plan where documents distributed in offering program were not sufficient to explain retirement health care benefits being offered without reference to the detailed benefit provisions in the existing group benefits plan, and where documents advised employees to refer to group benefits plan booklet for details); and Richmond v. NCR Corporation, 227 F. Supp.2d 802, 815 (S.D. Ohio 2002) (no separate ERISA plan where documents referred to current retiree health care and life insurance coverages).

The court concludes that the documents in question, do not, by their nature and number and references to other plan documents, constitute a stand-alone ERISA plan. As a matter of law, plaintiffs' proposed stand-alone plan documents do not evidence an intention on the part of AT&T to create a stand-alone ERISA plan for purposes of the SRO. *See*, DeBoard, 208 F.3d 1228, 1238 (ultimate question is whether the evidence, considered as a whole, evinced an intent on the part of the company to establish such a plan; holding that it did by virtue of an October 3 letter to employees which contained details regarding operation of the plan and procedures); Chiles, 95 F.3d at 1511 (employer intended to create four separate plans, not one ERISA plan). Rather than a new, stand-alone ERISA plan, the documents simply describe a special incentive program. To the relatively minor extent the documents addressed any medical or dental benefits, they clearly refer the reader to existing plan documents.

Furthermore, if, for purposes of analysis, the documents *were* to be treated as constituting a stand-alone ERISA plan, plaintiffs would still be required to identify at least some language in those documents capable of supporting the inference that the

stand-alone plan clearly and expressly vested plaintiffs' permanent entitlement to the Medicare Part B reimbursements or to dental coverage.

In that regard, plaintiffs cite language, in Ex. 10 (at p. 28), which states:

Employees retiring on or after March 1, 1990, will be subject, as of July 1, 1995, to sharing in some portion of medical expense premium payments to help control growing post-retirement health-care costs.

This provision, however, only states that employees retiring later will be subject to future sharing of medical premiums.  Plaintiffs argue that, *by inference*, this statement must mean that employees who retire under the SRO will *not*, unlike employees who retire later, be subject to increased premium payments.  Language which vests welfare benefits, however, must be clear and express.  <u>Chiles</u>, 95 F.3d at 1513 (emphasis added).  An inference, by definition, is not express.  The court rejects plaintiffs' argument.

Plaintiffs also cite more generalized language from Exhibits 10, 16 and 32 which states, for example:  that "medical expense plan coverage will continue during your retirement"; that, the combination of Medicare and coverage from the company "will continue to provide the same level of coverage you have under the Plan alone"; that dental coverages "will continue"; and that dental expense plan "Coverage ceases at the end of the month in which the retiree dies."  (Doc. no. 126, p. 13-14, and exhibits themselves.)  References to continuing coverages are necessarily references to the continuation of *existing* coverage, however, and it is undisputed that the existing coverage included AT&T's reservation of its rights to reduce or eliminate the medical and dental benefits in question.

The court finds that plaintiffs have not identified any language that vests entitlement to undiminished reimbursement for Medicare Part B payments, or to undiminished dental coverage, permanently into the future, for employees who retired as a part of the SRO.  Nor have plaintiffs argued that any of the stand-alone plan

language upon which they rely is ambiguous. (Doc. 135, p. 13 of 15: "Plaintiffs do not believe that the documents in issue are ambiguous.") Their briefing cites evidence extraneous to plan language only in the event that the court disagrees and finds plan language ambiguous. The court finds that none of the language in question is ambiguous.

In summary, with respect to plaintiffs' claims for Medicare Part B reimbursements and dental coverage, the court finds and concludes, first, that there was no stand-alone ERISA plan in conjunction with the special retirement option, and second, that if there were such a plan, no plan language vested any entitlement on the part of plaintiffs to permanent rights in undiminished Medicare Part B reimbursements or dental coverage. Either one of these determinations, separate and apart from any other determinations stated in this order, requires summary judgment in defendant's favor with respect to plaintiffs' claims for the Medicare Part B reimbursement and dental coverage benefits.

## V. Conclusion

The court's conclusions in this order leave the plaintiffs with no recourse against AT&T for the benefits the plaintiffs undoubtedly expected and believed that they had earned by dint of their decades of service to AT&T – a result that illustrates, at the expense of these retirees, but one of the many ironies inherent in ERISA's preemptive regulation of employee welfare plans.

Under the law that governs this case, the dispositive fact is the fact that plaintiffs are not participants in any ERISA plans sponsored or administered by AT&T. As a result, plaintiffs may not use ERISA to secure the relief they seek in this action from AT&T. Alternatively, if the court reaches the merits and construes the plan documents, AT&T is entitled to judgment because, as a matter of law, the plan

documents do not clearly and expressly vest plaintiffs' entitlement to the benefits in question.

After careful consideration of the pleadings, the record, and the relevant legal authorities, AT&T's motion for summary judgment is **GRANTED** on the basis set forth in Part III, above.  In the alternative, AT&T's motion for summary judgment is **GRANTED** on the basis set forth in Part IV, above.

These rulings moot defendant's motion to strike jury demand and plaintiffs' motion to certify class.  Those motions are **STRICKEN**.

Dated this 8th day of November, 2007.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

04-0281p024(pub).wpd